### ANTIS et al. v. MONTGOMERY WARD & CO., Inc.

No. 4404.

District Court, E. D. Michigan, S. D.

Dec. 21, 1945.

George S. Fitzgerald and Daniel G. Shea, both of Detroit, Mich., for plaintiff.

Max L. Veech, and Dickinson, Wright, Davis, McKean & Cudlip, all of Detroit, Mich., and R. B. Wynne, of Chicago, Ill., for defendant.

LEDERLE, District Judge.

I. This is an action by 81 Detroit warehouse employees of Montgomery Ward & Co., in 43 different job classifications, seeking unpaid overtime compensation in accordance with the terms of the Fair Labor Standards Act. Plaintiffs were paid straight time for overtime work and their request here is for damages aggregating $50,000, being double the amount of unpaid extra one-half time for overtime, plus an allowance of a $4,000 fee to their attorney. Early in the pendency of the proceeding, upon request of plaintiffs and at a cost of some $1,500, defendant furnished a detailed statement of hours worked and wages paid in various classifications for each individual employee during the entire time in question. Several pre-trial conferences were held and unsuccessful attempts made to obtain from plaintiffs a comprehensive statement of facts or proposed stipulation of facts covering their various claims. On the eve of trial plaintiffs presented a short proposed stipulation of a few facts, which, with a few minor changes, was consented to by defendant. The order for trial requested each side to present proposed findings of fact and conclusions of law three days before trial. Defendant complied with this request, supplementing its aforesaid statement of wages and hours with a 42 page document, in which it fairly detailed most of the facts herein involved. This document was reviewed at the opening of trial, defendant conceded the facts to be as therein set forth, and, except for a few minor points, it was conceded by plaintiffs to contain a correct and complete statement of facts. This procedure saved considerable time, aided the court, and made it unnecessary for plaintiffs' counsel to prove the essential facts. The following findings, numbered II (1) to (33), inclusive, are based upon this document, as supplemented by the few minor matters developed upon the trial.

II. (1) The defendant is an Illinois corporation, duly qualified to transact business in the State of Michigan.

The defendant is a merchandising company doing business in all forty-eight states of the Union; it sells approximately $500,000,000 worth of merchandise annually to approximately 30,000,000 customers; it operates over 600 retail stores, 190 mail order offices and ten mail order houses; its general administrative offices and a wholesale warehouse, as well as two mail order houses and one retail store, are located in Chicago; it sells building materials, farm machinery, heating apparatus, plumbing supplies, electrical and auto supplies, repair parts, clothing, shoes, drugs, furniture, hardware, home furnishings, and dry goods; it operates three factories which are minor compared to its entire business, which supply about 2% of the total merchandise sold by the Company. All other merchandise is purchased from independent manufacturers or wholesalers. The central executive and administrative offices of the Company are in Chicago.

The defendant operates in excess of 30 retail stores in the State of Michigan. Four of said retail stores are in the Detroit area, one being located in Royal Oak, one at 13551 Michigan Avenue, Dearborn, one at 15406 Grand River Avenue, Detroit, and one at 14455 Gratiot Avenue, Detroit. The Company also has a catalog telephone order desk in each of the retail stores in the Detroit area.

(2) The defendant's Retail Department is divided into Regions, which, in turn, are subdivided into Districts. The retail store business is operated separately and independently of the mail order business of the defendant.

(3) On the date this action was instituted (September 28, 1944), District 7 of Region 2 of the Retail Department was comprised of five units, all of which are located in the Detroit area. The addresses and opening dates of the respective units of District 7 are as follows:

| Unit | Address | Opening Date |
|---|---|---|
| Royal Oak Store | 4th & Washington Sts. Royal Oak, Michigan | 1929 |
| Dearborn Store | Michigan & Schaefer Sts. Dearborn, Michigan | October 1937 |
| Gratiot Store | Gratiot near Seven Mile Road Detroit, Michigan | August 1939 |
| Central Warehouse | 17th & Hancock and 15th & Warren Avenues Detroit, Michigan | October 1939 |
| Grand River Store | Grand River & Greenfield Detroit, Michigan | May 1940 |

(4) District 7 is under the general supervision of the Retail District Manager who has charge of the District office located in the Grand River Store. The following officers are associated with the Manager at the District Office:

> District Controller
> District Advertising Manager
> District Merchandise Managers
> District Protection Superintendent.

(5) Each of the five units of District 7 is under the immediate supervision of a manager. On September 28, 1944, the names of the unit managers were as follows:

| | |
|---|---|
| Royal Oak Store | Robert M. Barden |
| Dearborn Store | R. L. Eastabrooks |
| Gratiot Store | Barton Williams |
| Central Warehouse | A. H. Lindabury |
| Grand River Store | L. E. French |

Each of the above managers is under the immediate and direct supervision of the Retail District Manager, Mr. R. W. Rosevear.

(6) The primary function of District 7 is to sell and deliver goods, wares, and merchandise to retail customers in the Detroit area. Its secondary function is to provide repair and service facilities for its retail customers.

(7) District 7 sells and delivers three general lines of merchandise to its retail customers in the Detroit area.

The A-Line (Wearing Apparel) is divided as follows:

| Division | Article |
|---|---|
| 9 | Fur coats |
| 10 | Cloth coats |
| 11 | Fashion accessories |
| 12 | Millinery |
| 14 | Silk dresses |
| 15 | Cotton dresses |
| 16 | Piece goods and notions |
| 18 | Blankets and Linens |
| 24 | Shoes |
| 26 | Rubber footwear |
| 29 | Underwear |
| 30 | Hosiery and accessories |
| 31 | Children's wear |
| 32 | Lingerie |
| 35 | Men's furnishings |
| 39 | Men's and Boys' Suits and Overcoats |
| 42 | Work clothes |

The B-Line (Home Furnishings) is divided as follows:

| Division | Article |
|---|---|
| 45 | Jewelry |
| 48 | Toys |
| 51 | Phonograph records |
| 53 | Toilet articles |
| 54 | Candy |
| 62 | Radios |
| 66 | Furniture |
| 68 | Stoves |
| 69 | Electrical refrigerators |
| 71 | Curtains and draperies |
| 72 | Rugs and floor coverings |
| 85 | Electrical Washing Machines, Vacuum Cleaners, etc. |

The C-Line (Hardware, Auto Accessories and hard goods) is divided as follows:

| Division | Article |
|---|---|
| 56 | Gasoline (Royal Oak, Gratiot and Grand River) |
| 60 | Sporting goods |
| 61 | Auto Accessories |
| 64 | Tires |
| 67 | Camera supplies |
| 74 | Roofing and building materials |
| 75 | Paint |
| 76 | Wall paper |
| 81 | Plumbing and heating |
| 83 | Electrical hardware |
| 84 | Hardware |
| 86 | House wares |
| 87 | Farm and garden supplies |

(8) At each of the retail stores one floor is devoted to storage. On this floor, the store management is able to carry a suffi-

cient supply of most of the divisions of merchandise above described to enable the store to meet the day to day needs of customers. Certain divisions of merchandise, however, because of the bulk or nature of the merchandise involved cannot be stored at the retail store. Therefore, the stores, in common with most all large retail stores, find it necessary to have outside storage space for the more bulky types of merchandise.

(9) Out of a total of 42 divisions of merchandise sold by District 7, it has been found necessary to have outside storage space for the following nine divisions:

| Division | Article |
|---|---|
| 62 | Radios |
| 66 | Furniture |
| 68 | Stoves |
| 69 | Electrical Refrigerators |
| 72 | Floor coverings |
| 85 | Washers and ironers |
| 74 | Roofing and building materials |
| 81 | Plumbing and heating |
| 87 | Fencing, fertilizer and feed. |

On rare occasions it has also been found necessary to have outside storage space for the following five divisions:

| Division | Article |
|---|---|
| 48 | Toys |
| 61 | Auto accessories |
| 86 | Household wares |
| 60 | Sporting goods |
| 84 | Hardware. |

All of the goods which fall in the remaining 29 divisions are stored at the retail stores.

(10) Prior to September 1, 1939, each of the three stores then in operation had outside storage facilities within its immediate vicinity. During the same period, the Dearborn and Royal Oak stores each maintained a repair and service department. The Gratiot store, which had just recently opened, was also in need of a repair and service department. Each of the stores also had its own delivery system.

(11) On or about September 1, 1939, defendant commenced using the Central Warehouse located at the corner of 17th and Hancock Streets in Detroit.

(12) District 7 has utilized the Central Warehouse for the following purposes:

A. To provide the Dearborn, Gratiot, and Grand River stores with additional temporary storage space for the nine divisions hereinabove mentioned.

B. To provide the Dearborn, Gratiot and Grand River stores with centralized facilities for deliveries to retail customers.

C. To house the "Detroit Central Service" department which furnishes all four stores and all the retail customers in the Detroit area with centralized repair and service facilities.

(13) Since September 1, 1939, with very rare exceptions, all merchandise (in all the 42 divisions above mentioned) purchased by retail customers at the Dearborn, Gratiot and Grand River stores, and delivered by the defendant to the homes of such customers, has been delivered from the central warehouse.

If the article to be delivered is held at the store, it is transported from the store to the warehouse in a shuttle truck. At the warehouse, it is unloaded from the shuttle truck into the shuttle bin. It is then moved from the shuttle bin to a delivery bin. From the delivery bin it is placed in a truck trailer and delivered to the customer's home.

If the article to be delivered is stored at the warehouse, it is moved from the storage bin to the delivery bin where it is placed on a truck trailer and delivered to the customer's home.

In some instances the retail customer calls at the warehouse and picks up the merchandise which he has purchased. All other deliveries to retail customers from the warehouse are made by J. E. Bejin Cartage Company, which is an independent contractor.

(14) The "Detroit Central Service" department renders the following services:

If one of the stores has a damaged article which is in need of repair, that article will be sent from the store to the Central Service Department for repair.

If a customer has an article (e. g., a vacuum sweeper) which is in need of service or repairs, it will either be brought to the Central Service Department for repair or the Department will send a repair man to the customer's home. In ordering service or repairs, the customer can call the Department direct or he can call the store, in which event his order will be forwarded to the Department.

Floor samples of furniture are assembled and polished before being sent from the warehouse to the store for display. The department also assembles and polishes all furniture before it is delivered from the warehouse to the retail customer's home.

Furniture destined for the customer's home is not taken from storage and assembled and polished until after the sale to the customer has been made at the store.

(15) Before the wartime shortage of merchandise the great bulk of the merchandise stored at the warehouse never passed through any of the retail stores. Sales at the stores were made from floor samples and deliveries were made from the stock at the warehouse.

(16) After the wartime shortage of merchandise became acute, a higher percentage of the merchandise was forwarded to the retail stores. This was true for two reasons, (1) merchandise in quantities sufficient to create a warehouse stock could not be obtained, and (2) the retail stores, because of the general shortage, would order several floor samples of the same article to fill vacant floor space. Nevertheless, even during the emergency period, the merchandise was returned to the warehouse for delivery after sale to the retail customer.

(16-a) That from about September 1, 1939 to January 1, 1943, approximately 25 per cent of the merchandise handled at the warehouse was distributed by requisition direct to the Dearborn, Gratiot, and Grand River stores, and approximately 75 per cent was distributed direct to retail customers from the warehouse. Most of the 25 per cent requisitioned to the stores was re-delivered to the warehouse where it was distributed to retail customers; that after January 1, 1943, approximately 50 per cent of the merchandise received at the warehouse was distributed to the stores by requisition and approximately 50 per cent was distributed direct to retail customers from the warehouse. Most of the goods distributed to the stores in this period were re-sent to the warehouses where it was distributed to retail customers.

(17) For the most part, none of the merchandise stored at the warehouse is ordered by the defendant to fill prior orders from retail customers.

(18) Except for one type of higher class furniture specifically ordered for specific customers prior to July, 1943, which constituted a small percentage of defendant's business, no part of the merchandise stored at the warehouse is ordered by the defendant in anticipation of the needs of specific customers.

(19) Approximately 77% of the merchandise received at the warehouse is received from sources outside Michigan. Approximately 23% is received from sources in Michigan.

(20) Approximately 4% of the merchandise received at the warehouse is either returned to the manufacturer or wholesaler within the State of Michigan for credit because of defects or other reasons, or shipped to other stores in Michigan for the purpose of reducing overstock or to supply a unit of merchandise temporarily for another store.

(21) Approximately 2% of the merchandise received at the warehouse is either returned to the manufacturer or wholesaler outside the State of Michigan for credit because of defects or other reasons, or shipped to other stores outside the State of Michigan for the purpose of reducing overstock or to supply a unit of merchandise temporarily for another store.

(22) Less than 1/10 of 1% of the merchandise received at the warehouse is delivered to customers outside the State of Michigan.

(23) From September 1, 1939 to February 1, 1943, as to merchandise received at and stored in the warehouse the manufacturer or wholesaler was instructed to ship the goods to the warehouse but to mail the invoice to the store. The warehouse would receive a copy of the order and when the merchandise arrived, the warehouse would check the goods received against the order. The warehouse's copy of the order would then be returned to the store marked "approved", and the invoice would be paid by the store. During this period goods stored at the warehouse were carried on the inventories of the individual stores, and the goods ordered by a specific store were assigned specified space in the warehouse and segregated from the goods ordered by the other stores.

(24) Since February 1, 1943, the merchandise stored at the warehouse is carried on the warehouse inventory until such time as it is delivered to the store or to a customer in pursuance of a sale made at the store at which time it is transferred to the store's inventory.

(25) From September 1, 1939 to February 1, 1943, the warehouse kept no separate inventory. All expenses in connection

with the warehouse were charged to the stores pro-rata as follows:

(a) Delivery expense was pro-rated on the basis of the dollar volume of merchandise delivered.

(b) Expenses in connection with the repair and service department were pro-rated on the basis of the number of service and repair jobs and calls.

(c) Rent was pro-rated on the basis of the space occupied.

(d) All other miscellaneous expenses were pro-rated upon the basis of the dollar volume of goods received at the warehouse by each store.

(26) Prior to February 1, 1943, the Royal Oak store had its own service department but also made some use of the "Detroit Central Service" department. It did not otherwise participate in the warehouse operation for the reason that it had its own warehouse and its own delivery system in Royal Oak. During this period it was charged a flat rate for each service call made by the "Detroit Central Service" department, but was not charged with any portion of the remaining warehouse expenses.

(27) From February 1, 1943 to June 1, 1944, the Royal Oak store participated fully in the warehouse operation and was charged with a portion of all the warehouse expenses. On June 1, 1944, the operation was abandoned by the District Management and since that date the Royal Oak store's participation in the warehouse operation has been limited to the "Detroit Central Service" department.

(28) During the period September 1, 1939 to September 28, 1944, the individual plaintiffs were employed by the defendant in varying capacities for varying periods of time. In the summary which follows, the plaintiffs are grouped so as to show the job at which each plaintiff worked and the period during which he was so employed.

## GROUP I

### Assembly

The assembler uncrates merchandise and sets-up any merchandise that is received in an unassembled condition. Merchandise is not uncrated or assembled until it is to be sent to customers or to the stores.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their names, were employed as assemblers:

| | |
|---|---|
| Johnson, Herbert | Apr. 12, 1940–Aug. 14, 1941 |
| Maple, Archie | Aug. 20, 1942–July 14, 1943 |
| Radtke, Edward | Sept. 1, 1939–Sept. 28, 1944 |
| Stevens, Charles | Mar. 1, 1943–Sept. 28, 1944 |
| Wilson, Harry | June 15, 1943–Sept. 28, 1944. |

## GROUP II

### Night-Cashier

The night cashier checks money from truck drivers which they have received from customers on C.O.D. deliveries. He also prepares a record of merchandise returned or refused by retail customers. The only money handled is receipts from sales to customers. He does not pay out any money.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as a night cashier:

| | |
|---|---|
| Kratz, Albert | Sept. 1, 1943–Sept. 28, 1944. |

## GROUP III

### Checker

A checker is concerned only with delivery of merchandise to retail customers. He supervises the placing of merchandise in delivery runs and checks merchandise against sales checks. He also supervises the order in which merchandise is to be placed in delivery trucks, so that merchandise destined for the first customer will be placed in the truck last. A checker physically arranges the merchandise in the delivery run prior to the time it is loaded on a delivery truck. All of his time is spent in delivery bin, or in connection with activities relating to deliveries.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as checkers:

| | |
|---|---|
| Beck, Harvey | July 15, 1943–Nov. 9, 1943 |
| Butkovich, Phillip | Sept. 20, 1940–May 13, 1943 |
| Cook, John | May 19, 1944–June 1, 1944 |
| Finn, Thomas | Nov. 24, 1943–Sept. 28, 1944 |
| Kinney, John | May 22, 1944–Sept. 28, 1944 |
| Miller, Edwin | July 15, 1943–Feb. 2, 1944; May 26, 1944–Sept. 28, 1944 |
| Perry, Billie | Sept. 18, 1944–Sept. 28, 1944 |
| Ring, James (Rehire) | July 19, 1943–Oct. 13, 1943 |
| Rivett, Roy | Sept. 3, 1943–Sept. 29, 1943 |
| Wansiak, William | Nov. 3, 1943–May 17, 1944. |

## GROUP IV

### Part-time Delivery Clerk

This is an office job, handling paper work only. It consists of handling telephone calls and inquiries from stores and customers, and complaints. Delivery clerks

have no part in ordering merchandise. Delivery clerks type a record of deliveries on trip sheets.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite her name, was employed as a part-time delivery clerk:

Tunesi, Florence      May 19, 1941–Sept. 30, 1942.

## GROUP V
### Delivery Clerk

The job of delivery clerk is an office job, handling paper work only. It consists of handling telephone calls and inquiries from stores and customers, and complaints. Delivery clerks have no part in ordering merchandise. Delivery clerks type a record of deliveries on trip sheets. Delivery clerks do not physically handle any of the merchandise transferred from the warehouse to the stores.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as delivery clerks:

Beske, Shirley      July 15, 1944–Sept. 28, 1944
Phillips, Avis      May 11, 1943–April 4, 1944
Rivett, Roy      July 22, 1940–Nov. 26, 1940.

## GROUP VI
### Night Receiving Clerk

A night receiving clerk checks merchandise back in from drivers; that is, merchandise which had been placed on a truck and an attempt made to deliver the merchandise to a retail customer. If delivery is not effected, merchandise is returned to the warehouse by the truck driver and the night receiving clerk checks this merchandise back into the warehouse.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as a night receiving clerk:

Kinney, John (Rehire)      Feb. 15, 1944–April 12, 1944.

## GROUP VII
### Delivery Supervisor

A delivery supervisor supervises the Delivery Department and is in charge of the checkers. If merchandise is damaged in delivery to the customer, he makes arrangements for pick-up of the merchandise. He also handles the telephone calls from the stores that have complaints. Employees under his supervision are checkers and delivery clerks. All of his activities and duties pertain to the delivery of merchandise to retail customers.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as delivery supervisors:

Butkovich, Phillip      June 26, 1944–Sept. 28, 1944
Szewc, Joseph      April 20, 1944–July 1, 1944

## GROUP VIII
### Delivery Report Clerk

The duties of this job are essentially the same as those of the delivery clerk; however, the report clerk supervises the work of the other delivery clerks. He also prepares delivery reports which show various pertinent details of delivery operation. All of his activities and duties pertain to the delivery of merchandise to retail customers.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name was employed as a delivery clerk:

Phillips, Avis      April 5, 1944–Sept. 28, 1944.

## GROUP IX
### Dispatcher

The dispatcher routes deliveries to customers. He receives sales checks covering merchandise which is to be delivered. He sorts these documents by route numbers and gives assistance to truck drivers in locating customers' addresses. He keeps a record of the number of trucks used each day. He sorts all sales checks in the exact order in which merchandise should be delivered. The dispatcher does not come in contact with merchandise until after it has been sold to the retail customer.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as dispatchers:

Malone, Thomas      May 17, 1943–Sept. 28, 1944
Rivett, Roy      Nov. 27, 1940–June 8, 1943
                Sept. 30, 1943–Sept. 28, 1944.

## GROUP X
### Furniture Wrapper

This job does not exist at the present time. The furniture wrapper has nothing to do with incoming merchandise. The furniture

wrapper wrapped furniture in paper at the time it was delivered to the customer in order to protect it from damage in transit.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as a furniture wrapper:

Nebus, Adolph      March 9, 1943–July 14, 1943.

## GROUP XI

### Polisher or Refinisher
### (Inside—Preparation)

A polisher or refinisher (Inside—Preparation) spends all of his time polishing furniture. He works in the Furniture Refinishing Room on the first floor. All furniture is polished before being released to customers or before being sent to the store for display. A polisher or refinisher spends all of his time working on furniture.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as Polishers or Refinishers:

| | |
|---|---|
| Burns, Stephanie | Apr. 11, 1942–Sept. 28, 1944 |
| Guthro, M. | Aug. 23, 1943–Sept. 28, 1944 |
| Nebus, Adolph | July 15, 1943–Sept. 28, 1944 |
| Whitlock, Herbert | March 7, 1941–Sept. 28, 1944. |

## GROUP XII

### Refinisher Helper

The refinisher helper was a polisher. He was considered an apprentice polisher or refinisher (inside—preparation); however, at the time Mr. Guthro was hired the major duties were polishing furniture. All of his work was done in the furniture refinishing room as this work was done on merchandise to be delivered to the customer, or to the stores.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as a refinisher helper:

Guthro, M.      June 14, 1943–Aug. 25, 1943.

## GROUP XIII

### Night Loader

The duty of the night loader is to take merchandise from the delivery runs and load it into the delivery trucks. The night loader handles only that merchandise which has been sold to the retail customer. He does not come in contact with the merchandise until after the sale at retail has been consummated.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as night loaders:

| | |
|---|---|
| Beck, Harvey | Nov. 10, 1943–June 21, 1944 |
| Cook, John | June 1, 1944–Sept. 28, 1944 |
| Hines, Otto | May 25, 1944–Sept. 28, 1944 |
| McCann, Thomas (Rehire) | Feb. 4, 1943–July 14, 1943 |
| (Rehire) | May 13, 1944–May 23, 1944 |
| Miller, Edwin | Feb. 3, 1944–May 25, 1944 |
| Ring, James (Rehire) | Feb. 4, 1943–June 4, 1943 (terminated) |
| Wansiak, William | May 18, 1944–Sept. 28, 1944. |

## GROUP XIV

### Shuttle Helper

A shuttle helper performs all of his work on the first floor, and this work is confined to loading and unloading shuttle trucks. Merchandise is loaded onto the shuttle trucks to be sent to the stores. Merchandise coming from the stores is unloaded from the shuttle truck into the shuttle bin and the shuttle helper moves it from the shuttle bin to either the delivery bin or the finishing room.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as shuttle helpers:

| | |
|---|---|
| Antis, Findley | Mar. 28, 1944–Sept. 15, 1944 |
| Chrichton, Andrew | Mar. 31, 1943–Sept. 28, 1944 |
| Meloche, Frank | July 15, 1943–Sept. 28, 1944 |
| Miller, Edwin | Aug. 20, 1942–July 14, 1943 |
| Ring, James | Jan. 27, 1940–Aug. 1, 1940. |

## GROUP XV

### Shuttle Supervisor

The shuttle supervisor is in charge of the loading and unloading of shuttle trucks, handling shipments to and from stores. He has several helpers who do about 75% of the actual labor involved in loading and unloading merchandise. The shuttle supervisor checks off the items as it is loaded and unloaded. He handles only merchandise that is going to or coming from the stores.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as a shuttle supervisor:

Krome, George      Apr. 18, 1943–Sept. 28, 1944.

## GROUP XVI

### Supervisor—Night

The night supervisor is in charge of the night crew of loaders and checkers. He is considered a supervisory employee. He is in complete charge of the warehouse at night and is responsible for all work done at night. He would check on the attendance of the employees and if a sufficient crew did not report for work, he would authorize those men who did report to work overtime until the work was completed. All night employees, except the watchmen, devote all of their time to activities pertaining to the delivery of merchandise to retail customers.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their names, were employed as night supervisors:

| | |
|---|---|
| Hines, Otto | April 24, 1944–May 24, 1944 |
| McCann, Thomas | July 15, 1943–Oct. 27, 1943 (terminated) |
| | May 24, 1944–Sept. 28, 1944 |
| Ring, James | Oct. 14, 1943–Apr. 21, 1944. |

## GROUP XVII

### Service Clerk

A service clerk does general work in the service department. She maintains a file of cards for mechanical appliances which have been sold, such as radios, irons, pumps, stockers, oil burners, etc. The warranty on these appliances for free service is effective for a limited period; therefore records are kept to show when warranty expires, and also reports of calls made to service appliances. This work is in connection with the servicing of merchandise in the hands of customers. The service clerk has no part in ordering merchandise or parts.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite her name, was employed as a service clerk:

| | |
|---|---|
| Shannon, Belle | Sept. 27, 1943–Dec. 1, 1943. |

## GROUP XVIII

### Furniture Refinisher and Repairman (Inside)

A furniture refinisher and repairman (inside) does all of his work within the furniture repair shop. His activities are confined to the refinishing and repairing of new furniture, customer's merchandise not repairable at the store. He spends all of his time refinishing and repairing furniture, and such other merchandise as is repairable at the repair shop.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as Furniture Refinisher and Repairmen (inside):

| | |
|---|---|
| Janush, Theodore | Jan. 20, 1941–Sept. 28, 1944 |
| Laskasky, Albert | Feb. 19, 1943–Sept. 28, 1944 |
| Utich, Albert | Mar. 16, 1942–Sept. 28, 1944 |
| Whitlock, Charles | Sept. 1, 1939–Sept. 28, 1944. |

## GROUP XIX

### Refinisher (Outside)

In this job the employee does minor furniture repair work at customer's home. He investigates complaints of damage and if repairs cannot be made or customer objects, he decides on return of merchandise to warehouse for repair, exchange or adjustment. This is a full-time job. He works on furniture which has already been placed in the customer's home; he spends at least one day a week in the retail store doing minor refinishing on floor samples; and depending upon business conditions spends some time at the warehouse repairing furniture which has been damaged in the customer's home, or at the retail store or in warehouse handling, or in transit.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as refinishers (outside):

| | |
|---|---|
| Coupland, Herbert | Aug. 31, 1943–Sept. 28, 1944 |
| Lyons, Ernest | Oct. 8, 1940–Sept. 28, 1944 |
| Reno, Frederick | May 15, 1941–Sept. 28, 1944 |
| Reinhardt, Bert | March 7, 1940–Sept. 28, 1944. |

## GROUP XX

### Head Refrigerator and Head Repairman

This employee was in charge of all mechanical service repairmen. He supervised all shop work in connection with repair of appliances and spent practically all of his time actually doing service work. He spent all of his time in connection with the repair of merchandise owned by customers and sent back for repair.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, returned on complaint, and floor samples was employed as Head Refrigerator and Head Repairman:

| | |
|---|---|
| Purtell, Noel | Aug. 2, 1940–Sept. 28, 1944 |

## GROUP XXI

### Service Stock Clerk

In this job employee controls the stock of repair parts used in repairing merchandise previously sold to customers. He maintains perpetual inventory records and an adequate supply of spare parts. His activities are confined to the Detroit Central Service Department.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as service stock clerk:

Lyons, Austin          Sept. 22, 1943–Sept. 28, 1944.

## GROUP XXII

### Service Radio

This job is radio service which means repairing radios in customers' homes and also working in the shop on radios which were sent in by customers for repair. All of the employee's time is spent in repairing radios belonging to retail customers.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as Service Radio:

Sharpe, Charleton      Sept. 1, 1939–Sept. 28, 1944
Wolfe, Charles         July 6, 1942–Sept. 15, 1943.

## GROUP XXIII

### Mechanical Service

This job was repairing mechanical appliances, both in the customers' homes and also in the service repair shop. All of the employee's time was spent in repairing appliances belonging to retail customers.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as mechanical service:

Purtell, Noel          Sept. 1, 1939–August 1, 1940
Vierk, F.              Aug. 5, 1943–Sept. 28, 1944.

## GROUP XXIV

### Floormen and Sub-Floormen

A floorman or sub-floorman is responsible for a section of the warehouse and his activities are generally confined to this particular section. He sees to it that merchandise is properly stored and that merchandise is shifted from place to place as required. He takes an active part in handling this merchandise. He is responsible for the orderly arrangement, proper classification, and consolidation of merchandise in his section of the warehouse. He also sees that adequate measures are taken for the protection of merchandise stocks to prevent damage. The floorman is also responsible for order filling; taking an active part in this work along with a sub-floorman. By order filling is meant that merchandise is taken from a stack, pile, or from a rack or decking and moved to the elevator preparatory to moving it to the first floor of the warehouse to be placed in delivery runs. He is also responsible for seeing that his section of the warehouse is kept clean by those assigned to do cleaning work.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as Floormen and Sub-floormen:

Beck, Harvey           June 22, 1944–Sept. 28, 1944
Butkovich, Phillip     May 14, 1943–June 25, 1944
Butler, Delmus         June 17, 1943–Sept. 28, 1944
Hallet, Lester         July 15, 1943–Oct. 17, 1943
Hallum, Edward         July 15, 1943–Sept. 28, 1944
Helvy, George          July 15, 1943–Sept. 28, 1944
Maple, Archie          July 15, 1943–Sept. 28, 1944
Ring, James            Apr. 22, 1944–July 5, 1944
Rooksbury, Francis     July 15, 1943–Sept. 28, 1944
Szewc, Joseph          July 15, 1943–Apr. 19, 1944
                       July 2, 1944–Sept. 28, 1944.

## GROUP XXV

### Floorman (Stoves and Appliances)

In this job Joseph Szewc was a floorman who had charge of the section of the warehouse where major appliances and floor coverings were stored. His duties were to fill customer's orders and store requisitions for floor samples and, in connection therewith, to prepare the stoves and appliances for delivery. He took no part in ordering or procuring merchandise.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as floorman (stoves and appliances):

Szewc, Joseph          Oct. 2, 1941–July 14, 1943.

## GROUP XXVI

### Stockmen or Warehousemen

A stockman is assigned to and generally confines his activities to one floor. He spends his time in stockkeeping, order filling and housekeeping.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs were employed as stockmen during the periods set opposite their respective names:

| | |
|---|---|
| Beck, Harvey | Oct. 26, 1942–July 14, 1943 |
| Bloom, Ernest | Aug. 19, 1942–Feb. 18, 1943 |
| Butler, Delmus | Apr. 11, 1942–June 16, 1943 |
| Carroll, Thomas | Sept. 5, 1944–Sept. 28, 1944 |
| Farrell, John | Jan. 28, 1943–April 29, 1943 |
| (Rehired) | Sept. 14, 1943–Dec. 22, 1943 |
| | Jan. 3, 1944–Mar. 29, 1944 |
| Carroll, Thomas (Additional period) | Nov. 5, 1943–Feb. 2, 1944. |
| Finn, Thomas | Mar. 1, 1943–Nov. 23, 1943 |
| Gazo, Paul F. | July 3, 1943–Aug. 18, 1943 |
| | July 13, 1944–Sept. 6, 1944 |
| Goodson, Ben | Feb. 1, 1943–Sept. 28, 1944 |
| Hallet, Lester | June 1, 1942–Jan. 2, 1943 (terminated) |
| (Rehired) | Mar. 25, 1943–July 14, 1943 |
| Hardy, Carlos | Apr. 17, 1944–Sept. 28, 1944 |
| Helvy, George | Feb. 27, 1943–July 14, 1943 |
| Hesterberg, William | Feb. 1, 1943–July 14, 1943 |
| Hines, Otto | May 14, 1942–Oct. 2, 1942 |
| Hallum, Edward | July 24, 1942–July 14, 1943 |
| Johnson, Herbert | Aug. 15, 1941–May 5, 1943 |
| Kapola, Raymond | June 28, 1944–Sept. 28, 1944 |
| Kinney, John | Sept. 29, 1942–Oct. 7, 1942 (terminated) |
| (Rehired) | Oct. 13, 1942–Dec. 24, 1942 (terminated) |
| (Rehired) | Jan. 7, 1943–March 25, 1943 |
| Lovelady, Jay | June 20, 1944–Aug. 30, 1944 |
| Marr, John | Mar. 22, 1943–Sept. 28, 1944 |
| Meloche, Frank | Sept. 3, 1942–July 14, 1943 |
| O'Brien, Patrick | Aug. 11, 1943–Sept. 28, 1944 |
| Perry, Billie | July 14, 1944–Sept. 17, 1944 |
| Ring, James | Sept. 7, 1939–Jan. 26, 1940 |
| | Aug. 2, 1940–Aug. 7, 1941 (terminated) |
| Robinson, James | Mar. 11, 1944–Sept. 28, 1944 |
| Robinson, John F. | May 4, 1944–Sept. 28, 1944 |
| Robinson, Jay E. | May 4, 1944–Sept. 28, 1944 |
| Rooksbury, Francis | May 10, 1943–July 14, 1943 |
| Sheehan, John | Feb. 5, 1943–Sept. 28, 1944 |
| Szewz, Joseph | Aug. 2, 1940–Oct. 1, 1941 |
| Toupin, Arthur | Feb. 13, 1943–Sept. 28, 1944 |
| Wilson, Harry | Feb. 16, 1943–June 2, 1943 (terminated) |
| Vickery, George | Sept. 23, 1943–Jan. 26, 1944 |
| | Apr. 6, 1944–Sept. 28, 1944 |
| Wright, James | June 6, 1942–July 30, 1942. |

## GROUP XXVII

### Assistant Cashier

The assistant cashier has no duties peculiar to that job. She merely assists the Head Cashier, who pays all bills, makes up pay roll, keeps personnel records, makes up daily, weekly, and monthly cash reports.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite her name, was employed as assistant cashier:

| | |
|---|---|
| Smith, Elsie M. | July 2, 1943–Sept. 28, 1944. |

## GROUP XXVIII

### Clerical

This job has been eliminated. This was a temporary job created for the purpose of transferring the physical inventory count onto stock cards and making tags for merchandise.

During the period Sept. 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as clerical:

| | |
|---|---|
| Dahlstrom, Ursula | Mar. 9, 1943–May 25, 1943 |
| Geerling, Cornelius | Feb. 22, 1943–June 29, 1943 |
| Graebert, Gustave | Feb. 5, 1943–May 6, 1943 |
| Smith, Elsie M. | March 5, 1943–July 1, 1943. |

## GROUP XXIX

### Clerical—Stock Control Department

Maintains register and records which show in detail the receipt of documents covering sales of merchandise to customers where the customers' orders are filled from the warehouse, and covering delivery of merchandise from the warehouse to the stores. She records the receipt of sales checks and requisitions and all deliveries in fulfillment thereof. Also assists invoice record clerk.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite her name, was employed as Clerical—Stock Control Department:

| | |
|---|---|
| McKitrick, Nellie | May 3, 1943–Sept. 28, 1944. |

## GROUP XXX

### Stock Control Clerk

The cost clerk posts the record of the withdrawal of merchandise covering deliveries to retail customers or to the stores. This clerk also prepares stock lists for the store department heads showing merchandise on hand available for sale by the stores.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their names, were employed as Stock Control Clerks:

| | |
|---|---|
| Mortzfield, Delores | July 19, 1943–Sept. 29, 1943 |
| Shannon, Belle | Dec. 2, 1943–Sept. 28, 1944 |
| Tunesi, Florence | April 20, 1944–Sept. 28, 1944 |

## GROUP XXXI

### Cost Detail Clerk

A cost detail clerk makes extensions at selling and cost of the transfer of stock from the warehouse to the stores and of the deliveries to customers from warehouse

stock. She prepares daily, weekly, and monthly registers for all merchandise transferred out of warehouse stock.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite her name, was employed as Cost Detail Clerk:

Mortzfield, Delores     Sept. 30, 1943–Sept. 28, 1944.

## GROUP XXXII

### Switchboard

A switchboard operator operates the switchboard, placing local and long distance calls.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite her name, was employed as switchboard operator:

Dahlstrom, Ursula     May 26, 1943–Sept. 28, 1944.

## GROUP XXXIII

### Claim Clerk

The claim clerk files claims against carriers. He also files claims against suppliers on both receipts and deliveries. If a customer claims that merchandise was damaged by a Bejin truck driver in making delivery, the claim clerk would investigate the complaint, and if the Bejin driver was at fault, the claim clerk would seek adjustment.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as Claim Clerk:

Geerling, Cornelius     June 30, 1943–Sept. 28, 1944.

## GROUP XXXIV

### Receiving and Shipping Clerk
### (formerly Receiving Clerk)

A receiving clerk physically unloads merchandise from trucks and checks the number of pieces or cartons against that called for on the freight bill. He sometimes uses a hand truck to move merchandise from trucks to the elevator.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their names, were employed as Receiving and Shipping Clerks:

Carr, Patrick     Apr. 34, 1944–Sept. 28, 1944
Hines, Otto     Oct. 3, 1942–Apr. 23, 1944
Phelps, Robert     Dec. 5, 1943–Sept. 28, 1944
Szewc, Joseph     Feb. 22, 1940–Aug. 1, 1940.

## GROUP XXXV

### Receiving Register Clerk

The receiving register clerk records all data from freight bills covering incoming merchandise on a register. This is a record of all shipments received. This register is sent to the invoice record office with the orders. The receiving register clerk also makes up daily reports for the department heads or merchandisers at each store showing what merchandise has arrived in the warehouse and is available for selling by the stores. This arrival notice is transcribed from the receiving register. The receiving register clerk has no part in the ordering of merchandise.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their names, were employed as Receiving Register Clerks:

Graebert, Gustave     May 7, 1943–Sept. 28, 1944
Tunesi, Florence     Oct. 1, 1942–April 19, 1944.

## GROUP XXXVI

### Elevator Operator

An elevator operator runs the freight elevators and does some trucking of merchandise within the warehouse.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their respective names, were employed as Elevator Operators:

Hansen, George     Feb. 7, 1944–Sept. 28, 1944
Heemsoth, H.     Aug. 10, 1943–Sept. 28, 1944
Hesterberg, William     July 15, 1943–Sept. 28, 1944
Wansiak, William     Apr. 16, 1943–Nov. 2, 1943
Wilson, Harry (Rehire)     June 17, 1943–July 14, 1943.

## GROUP XXXVII

### Shipping and Receiving Supervisor

In this job Mr. Johnson was in charge of all receipts of merchandise. That is, he was responsible for the crews unloading merchandise from trucks and also from trucks and from freight cars. In addition to supervising the crews unloading freight cars and trucks, he was also in charge of shipping and receiving clerks, the claim clerks, and the receiving register clerks.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as Shipping and Receiving Supervisor:

Johnson, Herbert     May 6, 1943–Sept. 28, 1944.

## GROUP XXXVIII

### Freight Receiving Floorman

In this job employee is responsible for the receipt of all rail shipments and is in charge of the freight car unloading crew. He performs physical labor along with his crew, doing the same type of work. He also does paper work which consists of keeping track of cars coming in. He is entirely responsible for handling incoming cars promptly, releasing the cars to prevent the payment of demurrage and any paper work connected with the above.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as Freight Receiving Floorman:

Bloom, Ernest      Aug. 2, 1943–Sept. 28, 1944.

## GROUP XXXIX

### Freight Car Receiving

In this job employee removes merchandise from freight cars. All of his time is spent in this activity.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs, for the period set opposite their names, were employed as Freight Car Receiving:

Bloom, Ernest      Feb. 19, 1943–Aug. 11, 1943
Farrell, John (Rehire)      Apr. 11, 1944–Sept. 28, 1944
Sheehan, John      Feb. 3, 1944–Sept. 28, 1944.

## GROUP XXXX

### Janitor

The janitor sweeps and cleans floors, stairways, restrooms, and the yards. He handles none of the merchandise stored in the warehouse.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as Janitor:

McCarthy, Timothy      Apr. 19, 1943–Sept. 28, 1944.

## GROUP XXXXI

### Engineer

In this position Mr. Graham supervises watchman-foreman. He is in charge of all maintenance work in the warehouse. He is an engineer and does not handle merchandise.

During the period September 1, 1939 to September 28, 1944, the following plaintiff, for the period set opposite his name, was employed as Engineer:

Graham, William      Feb. 16, 1940–Sept. 28, 1944.

## GROUP XXXXII

### Fireman-Watchman

A fireman-watchman has no physical contact with the merchandise. He has no occasion to handle merchandise at any time. He patrols the warehouse, fire boilers in season, and assists in maintenance work during the summer season.

During the period September 1, 1939 to September 28, 1944, the following plaintiffs were employed as Firemen-Watchmen during the periods set opposite their respective names:

| | |
|---|---|
| Carroll, Thomas | Feb. 3, 1944–Sept. 28, 1944 |
| Conlin, Alexander | Apr. 14, 1941–Sept. 28, 1944 |
| Hansen, George | Feb. 19, 1943–Feb. 6, 1944 (terminated) |
| McGann, Thomas | June 4, 1941–June 11, 1942 (terminated) |
| Vickery, George | Jan. 27, 1944–Apr. 5, 1944 |
| Wright, James | July 31, 1942–Sept. 28, 1944. |

## GROUP XXXXIII

### Plumbing Warehouse Supervisor

In this position Mr. Hallet was in charge of all the activities in the plumbing warehouse located at 2532 West Warren Avenue. He supervised all activities carried on at the plumbing warehouse and every warehouse employee is under his supervision. He was a supervisory employee. His primary duty was the management of the plumbing warehouse. He customarily and regularly directed the work of other employees in the plumbing warehouse. His suggestions as to hiring and firing were given particular weight. He customarily and regularly exercised discretionary powers. He received a salary in excess of $30 per week. The hours spent by him in doing work of the same nature as that performed by non-exempt employees did not exceed 60% of the number of hours worked in the work-week by the non-exempt employees under his direction.

During the period September 1, 1939 to September 28, 1944, the following plaintiff was employed as plumbing warehouse supervisor during the period set opposite his name:

Hallet, Lester      Oct. 18, 1943–Sept. 28, 1944.

(29) In District 7, Region 2, employees are at times transferred from store to store, from warehouse to store, and from store to warehouse.

(30) Practically all of the activities carried on by the employees at the Central

Warehouse are also carried on by employees at the stores in District 7, Region 2.

(31) From and after September 1, 1939, the plaintiffs, and each of them, received compensation at not less than the regular hourly rates at which they were employed for all hours, if any, worked in each work week.

(32) From and after March 19, 1943, the plaintiffs, and each of them, received compensation at a rate of not less than one and one-half times the regular rate at which they were employed for all hours, if any, worked on Sunday.

(33) From and after September 16, 1943, the plaintiffs, and each of them, received compensation at a rate of not less than one and one-half times the regular rate at which they were employed for all hours, if any, in excess of forty-four worked in each work week.

III. Defendant admitted that those plaintiffs whose activities are described in Group XXXIV (Receiving and Shipping Clerks), Group XXXVII (Shipping and Receiving Supervisor), Group XXXVIII (Freight Receiving Floorman) and XXXIX (Freight Car Receiving), were "engaged in commerce", but contended that none of the other plaintiffs was so engaged. Defendant also contended that plaintiff-employees were engaged in a "retail or service establishment, the greater part of whose selling or servicing" was in intrastate commerce within the meaning of Section 13(a) (2) of the Fair Labor Standards Act, 29 U.S. C.A. § 213(a) (2), and also in a "local retailing capacity" within the meaning of Section 13(a) (1) of the said Act. As to plaintiff Lester Hallet, Plumbing Warehouse Supervisor since October 18, 1943, defendant contended specifically that he was employed in a "bona fide executive" capacity within the meaning of Section 13 (a) (1) of said Act.

IV. As was said in Fletcher v. Grinnell Brothers, 6 Cir., 150 F.2d 337, 339, the defendant "falls within the category of a chain store organization. Here, as in the Phillips case (A. H. Phillips Inc. v. Walling, 324 U.S. 490, 65 S.Ct. 807, 157 A.L.R. 876) [plaintiff] employees 'are performing wholesale duties in the very midst of the stream of interstate commerce. They constantly deal with both incoming and outgoing interstate shipments.'" The defendant's warehouse employees, plaintiffs here, are engaged in commerce.

V. Defendant's warehouse is not a retail or service establishment, the greater part of whose selling or servicing is in intrastate commerce.

VI. None of the plaintiffs is customarily and regularly engaged in either making retail sales, the greater part of which are in intrastate commerce, or in performing work immediately incidental thereto, such as the wrapping or delivery of packages, whose hours of work of the same nature as that performed by non-exempt employees do not exceed 20 per cent of the number of hours worked in the work-week by such non-exempt employees.

VII. From and after October 18, 1943, plaintiff Lester Hallet was in sole charge of the plumbing warehouse, a physically separated branch establishment of the defendant.

VIII. At no time during the period in question was any plaintiff employee engaged in the production of goods for commerce.

IX. Plaintiffs' counsel requested, as to each plaintiff who might prevail herein, a fee allowance of $50, or an aggregate of $4,000. This was predicated upon an estimate of 800 hours work spent on this case, a record of which was not maintained, during the year since his retainer in this matter. Plaintiffs have signed contracts to also compensate their counsel independently on a contingent fee basis for legal services herein. Throughout the pendency of this litigation, plaintiffs' counsel has had the cooperation of defendant in ascertaining and presenting every material fact involved in this controversy, which substantially lessened the necessary legal services for plaintiffs.

Having in mind the nature and extent of the services of plaintiffs' counsel, the labor, time and trouble involved, the results achieved, the character and importance of the matters, the learning, skill and experience required and exercised, the necessity for the services rendered and time spent, and the contingency or absoluteness of fees, the reasonable value of the services of plaintiffs' counsel, compensable by defendant under said Act, is $2,000.

## Conclusions of Law

I. This is an action brought under the Fair Labor Standards Act of 1938, an act of Congress regulating commerce, and, the parties being located in this District,

this court has jurisdiction. 29 U.S.C.A. § 201 et seq.; 28 U.S.C.A. § 41(8); 28 U.S.C.A. § 112.

■ II. The test of coverage of such Act is the nature of the employment of the particular plaintiff. Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

■ III. Where, as here, no plaintiff-employee is engaged in the production of goods for commerce, whether or not the defendant-employer is required to pay to any plaintiff-employee the minimum overtime wages established by said Act, is determined by whether or not such plaintiff-employee is engaged in commerce. 29 U.S.C.A. § 207.

IV. Commerce, as defined by said Act, means trade, commerce, transportation, transmission or communication among the several States or from any State to any place outside thereof. 29 U.S.C.A. § 203.

■ V. Where it appears that an employee, as plaintiff Lester Hallet in his employment since October 18, 1943, as Plumbing Warehouse Supervisor, is in sole charge of all activities of a physically separated branch establishment of defendant-employer, that he supervises all activities carried on at such establishment, that every employee of such establishment is under his supervision, that his primary duty is management and supervision of such establishment, that he customarily and regularly directs the work of other employees therein, that his suggestions as to hiring and firing are given particular weight, that he customarily and regularly exercises discretionary powers, and that he is compensated for his services on a salary basis at not less than $30 per week exclusive of found, the overtime wage provisions of said Act do not apply to him. 29 U.S.C.A. § 213(a) (1) as defined by the Administrator in regulation appearing in 1940 Supp. Code of Fed. Reg., Title 29, Sec. 541.1.

■ VI. Where it appears, as it does here relative to all other classes of plaintiff-employees, that they are engaged in commerce at an employer's establishment, which is not a retail or service establishment the greater part of whose selling or servicing is in intrastate commerce, and that none of such employees is customarily and regularly engaged in either making retail sales, the greater part of which are in intrastate commerce, or in performing work immediately incidental thereto, such as the wrapping or delivery of packages, whose hours of work of the same nature as that performed by non-exempt employees do not exceed 20 percent of the number of hours worked in the workweek by such non-exempt employees, the employer is required to compensate them at the minimum overtime rate as established by said Act. 29 U.S.C.A. § 207; 29 U.S.C.A. § 213(a) (1) and (2), as defined by the Administrator in regulation appearing in 1940 Supp.; Code of Fed.Reg., Title 29, Sec. 541.4; A. H. Phillips v. Walling, 324 U.S. 490, 65 S.Ct. 807, 157 A.L.R. 876; Fletcher v. Grinnell Bros., 6 Cir., 150 F.2d 337.

VII. It therefore follows that judgment shall be entered herein as follows:

(1) No cause of action as to the claim of Lester Hallet for the period commencing October 18, 1943, during which he was employed as Plumbing Warehouse Supervisor.

(2) Against defendant, and in favor of each other plaintiff, including plaintiff Lester Hallet in other job classifications, for double the amount of unpaid overtime compensation in accordance with said Act, as per figures agreed upon in Exhibit 8, the computation of salaries due.

(3) Allowing to plaintiffs' counsel a reasonable attorney fee to be paid by the defendant, in the amount of $2,000.

(4) Allowing to the plaintiffs their costs of this action.

(5) Making provision for the satisfaction of such judgment by proper allocation of the various amounts thereof between wages which an employer is required to withhold by law for taxes, etc., and the balance payable to the employees. 29 U.S.C.A. § 216.

VIII. Counsel are requested to appear before this court at 10 A. M. on January 10, 1946, at which time plaintiffs shall present a judgment in accordance herewith, and, if desired, any requests for amendment hereof can then be considered.